UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHILD EVANGELISM FELLOWSHIP NORCAL, INC., <br><br>Plaintiff, <br><br>v. <br><br>OAKLAND UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION, et al., <br><br>Defendants. | Case No. 24-cv-08945-HSG <br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** <br><br>Re: Dkt. No. 2 |

Pending before the Court is the motion for preliminary injunction filed by Plaintiff Child Evangelism Fellowship of NorCal, Inc. ("Plaintiff" or "CEF"). Dkt. No. 2. The Court held a hearing on the motion and requested supplemental briefing on the language of the proposed injunction. For the reasons detailed below, the Court **GRANTS** the motion for preliminary injunction.

I. **BACKGROUND**

Plaintiff CEF is a Christian nonprofit organization, and a subsidiary of Child Evangelism Fellowship, Inc., an international non-profit children's ministry. *See* Dkt. No. 1 ("Compl.") at ¶¶ 11, 14. Plaintiff alleges that for approximately two years it has attempted to obtain space at public schools in the Oakland Unified School District ("OUSD") to host its Good News Club meetings. *See id.* at ¶¶ 1, 41. The Good News Club meetings are Christian, afterschool enrichment programs that operate in elementary and middle schools and are open to all children free of charge. *See id.* at ¶¶ 14–15, 17. Plaintiff explains that its Good News Clubs "provid[e] religious and other teaching and activities to encourage learning, spiritual growth, and service to others, as well as social, emotional, character, and leadership development." *See id.* at ¶ 15.

Plaintiff alleges that OUSD officials have either denied its requests for afterschool space—or failed to respond at all—because of Plaintiff's religious viewpoint. *See id.* at ¶¶ 1–2, 41–117, 126. Plaintiff further argues that its treatment is due to limitations with OUSD's policies, both as written and as applied. Specifically, Plaintiff contends that OUSD's policies grant officials unfettered discretion in deciding which organizations will be permitted access to OUSD facilities and provide no deadline by which officials must grant or deny an organization's facility use request. *See id.* at ¶¶ 147–48, 164, 175, 190.

In its verified complaint, Plaintiff brings claims against OUSD and the OUSD Superintendent in her official capacity for violations of the Free Speech Clause, Free Exercise Clause, and Establishment Clause of the First Amendment; the Equal Protection Clause of the Fourteenth Amendment; and the California Civic Center Act, Cal. Educ. Code § 38134.[1] *See id.* at ¶¶ 139–192. Plaintiff also filed a motion for preliminary injunction to require OUSD to provide CEF access to OUSD facilities to conduct after school programs equal to the access that the District provides to similarly situated nonreligious organizations. Dkt. No. 2.

## II.  LEGAL STANDARD

A plaintiff seeking preliminary relief must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. A court must find that "a certain threshold showing" is made on each of the four required elements. *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011). Under the Ninth Circuit's sliding scale approach, a preliminary injunction may issue if there are "serious questions going to the merits" if "a hardship balance [also] tips sharply towards the [movant]," and "so long as the

---

[1] Because the superintendent is sued in her official capacity, and for ease of reference, the Court refers to Defendants collectively as "OUSD." The Court further notes that although Dr. Kyla Johnson-Trammell was originally named in the complaint as the OUSD Superintendent, it appears that Dr. Denise Saddler was appointed as Interim Superintendent in July 2025. Without official confirmation from the parties, however, the Court will not amend the case caption.

2

[movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Where a plaintiff seeks mandatory injunctive relief instead of prohibitory injunctive relief to maintain the status quo, a plaintiff's burden is "doubly demanding." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Such a plaintiff "must establish that the law and facts clearly favor her position, not simply that she is likely to succeed." *Id.* And the Ninth Circuit often cautions that a mandatory injunction "goes well beyond simply maintaining the status quo pendente lite [and] is particularly disfavored." *Id.* (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)). District courts therefore should deny such requests "unless the facts and law clearly favor the moving party." *Stanley*, 13 F.3d at 1320 (quotation omitted). Put differently, mandatory injunctive relief should never issue in "doubtful cases." *Garcia*, 786 F.3d at 740 (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011)).

## III. DISCUSSION

As the Court indicated during the preliminary injunction hearing, it is not clear how much of a dispute actually exists here. In response to the motion for preliminary injunction, OUSD explicitly acknowledged that CEF "has the same right of access to District schools as any other entity." *See* Dkt. No. 33 at 1, 9. In supplemental briefing, OUSD also appeared to agree to some policy changes, including a 30-day deadline to respond to any request to use District facilities. *See* Dkt. No. 40. Still, OUSD opposes the motion for preliminary injunction. *See* Dkt. No. 33. OUSD appears to suggest that CEF was not denied access to District facilities in this case because of its religious viewpoint, but rather because the schools had no available space due to existing afterschool programming. *See id.* at 1, 11–14. Some additional background is helpful in understanding the nature of the parties' apparent disagreement.

According to OUSD, it participates in the After School Education and Safety Program ("ASES") and Expanded Learning Opportunities Program ("ELOP"), which provide funding for optional educational and enrichment programming before and after school. *See* Cal. Educ. Code §§ 8482, *et seq.*; Cal. Educ. Code § 46120; *see also* Dkt. No. 33-1 ("Peña Decl."). To qualify for

3

funding, all afterschool programs must commence immediately after the regular school day and last until at least 6:00 p.m., and must operate for a minimum of 15 hours per week. *See* Cal. Educ. Code § 8483(a)(1)(A)(i). OUSD contracts with "lead agency partners" to provide its afterschool programming under ASES and ELOP. *See* Peña Decl. at ¶¶ 5–11, 14–15. Organizations may apply to become a "lead agency" at a school (meaning the primary provider of afterschool services at that school) by participating in a "Request for Qualifications Bidders Conference." *See id.* at ¶¶ 14, 15. According to OUSD, since 2021, its schools are only available between the end of the school day and 6:00 p.m. for lead agencies and their subcontractors. *See id.* at ¶ 18. OUSD contends that the lead agencies require access to a school's entire campus to meet the needs of the participating students, and also says that the District could not ensure safety with multiple programs operating at the same time. *See id.* at ¶¶ 22–25. The District thus contends that its policies require the denial of *all* requests to use school facilities before 6:00 p.m. unless the organization is a subcontractor of the lead agency on campus. *See id.* at ¶¶ 19, 22–24.

OUSD notes that CEF never applied to become a lead agency, and argues that its limited programming does not meet the rigorous requirements of ASES and ELOP to become a lead agency. *See id.* at ¶¶ 16–18. OUSD further contends that it advised Plaintiff that it could still contact lead agencies and request to become a subcontractor. *See id.* at ¶ 26. Despite these policies, however, OUSD also acknowledges that site administrators do not always limit afterschool activities to those provided by lead agencies. *See id.* at ¶¶ 20–21.

Plaintiff, for its part, alleges that it repeatedly attempted to obtain afterschool space through various channels—including via lead agencies—and was told that it could not operate its Good News Club specifically because of its religious affiliation. *See* Compl. at ¶¶ 1–2, 41–117, 126. Plaintiff alleges, for example, that it used the school's online "Facilitron" platform to submit a "facility use application" for space to host a Good News Club at Lincoln Elementary School. *See id.* at ¶¶ 45–46. In denying Plaintiff's request, Lincoln's principal, Mukta Sambrani, explicitly stated that "[a]s a public school, we are not in support of Evangelism on our campus." *See id.* at ¶¶ 47–51; *see also* Dkt. No. 1-6, Ex. 6. Similarly, Plaintiff reached out to OUSD's District Outreach Coordinator, Rodolfo Perez, to discuss obtaining space for a Good News Club at

4

Greenleaf Elementary School. *See* Compl. at ¶¶ 93–95; Dkt. No. 1-22, Ex. 22. Plaintiff alleges that Mr. Perez stated that CEF would not be permitted on campus because it was a religious club. *See* Compl. at ¶¶ 93–94. Other schools simply never responded to Plaintiff's requests at all. *See, e.g., id.* at ¶¶ 44, 66–68, 71, 109–110, 113–14.

In addition to submitting facility use applications at individual schools in the District, Plaintiff also sought access to on-campus space through OUSD's "community partnership forum." *See* Compl. at ¶¶ 37–38, 59, 118–121. Plaintiff submitted a community partner application in July 2023. *See id.* at ¶¶ 118, 122; *see also* Dkt. No. 1-32, Ex. 32. Afterward, Plaintiff met with Priscilla Parchia Hamilton, the OUSD District Program Manager at the Office of Expanded Learning, to discuss partnership opportunities. *See* Compl. at ¶ 121. As alleged, Ms. Hamilton suggested that CEF attempt to become a subcontractor with an existing afterschool partner. *See id.* at ¶ 120. However, Ms. Hamilton also told Plaintiff that CEF "would likely be denied access to the community partnership forum because it was religious." *See id.* at ¶¶ 60, 121. Ms. Hamilton further explained that "it would be almost impossible for CEF to gain access to any OUSD facility without such partnership status." *Id.* at ¶ 121. Plaintiff also contacted OUSD's Community Partnerships Manager, Martin Young. *See id.* Mr. Young responded that there were no open bids to become a lead agency. *See id.* at ¶¶ 119–123; Dkt. No. 1-33, Ex. 33. Finally, when Plaintiff reached out to become a subcontractor with Bay Area Resources Center ("BACR"), the lead agency for Greenleaf Elementary School, BACR responded that "we cannot have any [B]ible clubs at school. Sorry." *See id.* at ¶ 91; *cf.* Peña Decl. at ¶ 31 (listing BACR as lead agency with exclusive afterschool use of Greenleaf Elementary School campus).

Despite these repeated rejections, Plaintiff alleges that OUSD allows several similarly situated organizations to use its facilities for afterschool programming, only some of which are the "lead agencies" on campus.[2] *See id.* at ¶¶ 44, 61, 83, 100, 115, 127; *see also* Dkt. No. 1-10, Ex.

---

[2] These other groups include BACR, East Bay Agency for Children ("EBAC"), East Bay Asian Youth Center ("EBAYC"), Envisioneers, Girls Inc. of Alameda County, Higher Ground Neighborhood Development Corp., Jewish Community Center of the East Bay, Oakland Kids First, Oakland Leaf Foundation, Safe Passages, Ujimaa Foundation, YMCA of the East Bay, Youth Together, The Girl Scouts, and The Boy Scouts. *See* Compl. at ¶ 127. OUSD contends that some—though not all—of these organizations were lead agencies for the elementary schools at

5

10. For example, Plaintiff states that a similarly situated, nonreligious group named the "Rainbow Club" was permitted to meet at Greenleaf Elementary School. *See id.* at ¶ 100.

OUSD offers little in response to Plaintiff's factual allegations, but repeatedly asserts that—despite Plaintiff's allegations and supporting documentation to the contrary—CEF's requests for space were actually denied because the spaces were already in use by lead agencies. *See* Dkt. No. 33 at 11–14. To the extent OUSD's opposition relies on this factual dispute, the Court is not persuaded. OUSD's conclusory assertion contradicts what some officials explicitly told CEF, as documented in email communications, and is simply not plausible. OUSD's own declaration, written by the District's Expanded Learning Programs Coordinator, indicates that years after the implementation of ASES and ELOP "there have been occasions when OUSD's new policy has not been followed by site administrators," and organizations have been granted access to use school facilities. Peña Decl. at ¶ 20. OUSD may "quickly put a stop" to such uses, but only when it learns about such incidents. *Id.* Accordingly, the District may not sidestep this case or the motion for preliminary injunction by citing to the ASES or ELOP programs. The Court therefore turns to OUSD's remaining arguments.

### A.     Type of Injunction

As an initial matter, the parties appear to dispute what type of injunction Plaintiff is seeking. *See* Dkt. No. 33 at 9–10.

A preliminary injunction "can take two forms," either a "prohibitory injunction" or a "mandatory injunction." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009). "Prohibitory injunction[s]" simply "preserve the status quo pending a determination of the action on the merits," while "mandatory injunction[s]" "order[] a responsible party to take action." *Id.* (quotation omitted). "The relevant status quo is that between the parties pending a resolution of a case on the merits." *Arizona Dream Act Coal. v. Brewer*, 757

---

which CEF sought afterschool space. *See* Peña Decl. at ¶¶ 27–33(listing EBAYC, Girls Inc., EBAC, BACR, and Safe Passages as the lead agencies for Lincoln Elementary School, Allendale Elementary School, Sequoia Elementary School, Montclair Elementary School, Greenleaf Elementary School, Fruitvale Elementary School, and Oakland Academy of Knowledge during the relevant time period).

6

1    F.3d 1053, 1061 (9th Cir. 2014) (quotation omitted); *see also Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963) ("The status quo is the last uncontested status which preceded the pending controversy." (quotation omitted)).  As noted above, this distinction is significant because mandatory injunctions are "particularly disfavored," and a plaintiff's burden is "doubly demanding" when seeking one.  *Garcia*, 786 F.3d at 740.

Here, OUSD suggests that Plaintiff is seeking a mandatory injunction, but provides no real analysis to support this assertion.  *See* Dkt. No. 33 at 9–10.  Plaintiff, for its part, does not address this issue in its motion for preliminary injunction or reply brief at all.  *See generally* Dkt. Nos. 2, 36.  The Ninth Circuit has recognized that the difference between mandatory and prohibitory injunctions is a "somewhat artificial legal construct," and that there can be ambiguities.  *See Hernandez v. Sessions*, 872 F.3d 976, 997–98 (9th Cir. 2017).  On the one hand, Plaintiff's requested relief could be characterized as a prohibitory injunction:  preventing the District from violating the Constitution and California Civic Center Act when deciding which organizations get access to OUSD facilities for afterschool programming.  On the other hand, to the extent Plaintiff is asking the Court to required OUSD to alter its existing policies and protocols, this would change the status quo such that it could be considered a mandatory injunction.  Given the strength of Plaintiff's claims, as discussed in more detail below, the line between mandatory versus prohibitory injunctions does not seem dispositive here.  Out of an abundance of caution, however, the Court will assume that Plaintiff is seeking a mandatory injunction.

**B.    *Winter* Factors**

**i.    Likelihood of Success on the Merits**

Under the "sliding scale" approach for a preliminary injunction, "a stronger showing of one element may offset a weaker showing of another."  *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (citing *Cottrell*, 632 F.3d at 1131.  "[A]t an irreducible minimum, though, the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation."  *Id.* (quotation omitted).  And because the Court assumes that Plaintiff is seeking a mandatory injunction, it must establish that the law and facts clearly favor its position.  *See Garcia*, 786 F.3d at 740.  Plaintiff readily does so here.

7

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. Plaintiff alleges that OUSD has violated the Free Speech Clause because it provides afterschool access to OUSD facilities for programs by other nonprofit organizations, but denies CEF the same access because it is a religious group and because of the religious content of its Good News Club. *See* Compl. at ¶¶ 139–155.

In evaluating whether OUSD violated Plaintiff's First Amendment right to freedom of speech, the Court must identify the nature of the forum from which it was excluded. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) ("The standards that we apply to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum.") (quotation omitted). Plaintiff appears to argue that the OUSD school facilities are limited public forums. *See* Dkt. No. 2 at 10–11 (citing case law regarding restrictions on speech in limited public forum). OUSD is silent on this issue. *See* Dkt. No. 33. The Court therefore assumes for purposes of this motion and the afterschool activities at issue in this case that the schools are limited public forums. *Cf. Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) (considering limited public forums as those otherwise nonpublic places that the government has opened and reserved "for certain groups or the discussion of certain topics"); *Good News Club*, 533 U.S. at 106 (assuming without deciding that opening school district's facilities after school for social, civic, and recreational purposes created a limited public forum).

"When the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech." *Good News Club*, 533 U.S. at 106. "The State's power to restrict speech, however, is not without limits." *Id.* "The restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be reasonable in light of the purpose served by the forum." *Id.* (quotation and citations omitted). As the Supreme Court has explained, "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828; *see also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("[T]he First

8

Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.") (quotations omitted).

In a similar case, the Supreme Court found that a school district engaged in viewpoint discrimination when it excluded a Good News Club from using its facilities after school. *See Good News Club*, 533 U.S. at 107–08. The Supreme Court explained that the school had opened its doors after school "to activities that serve a variety of purposes, including events pertaining to the welfare of the community." *Id.* at 108 (quotation omitted). This included "the teachings of morals and character." *See id.* Having done so, the court held that the district could not exclude religious groups that were similarly teaching morals and character, albeit from a religious viewpoint. *Id.* The Court rejected the argument that something "'quintessentially religious' or "decidedly religious in nature" could not "also be characterized properly as the teaching of morals and character development from a particular viewpoint." *See id.* at 111. The Court thus reaffirmed that "speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." *Id.* at 112.

Here, OUSD opens its campus after school under the ASES and ELOP programs broadly "to provide academic and literacy support and safe, constructive alternatives for youth." *See* Cal. Educ. Code § 8482; *see also* Peña Decl. at ¶¶ 2, 4. Plaintiff alleges that this includes other organizations that offer programs instilling values similar to CEF, such as the Jewish Community Center of the East Bay and the Girl Scouts and Boy Scouts. *See* Compl. at ¶¶ 127, 129–132. Plaintiff provides some evidence supporting its argument that schools and lead agencies nonetheless explicitly refused to allow CEF on campus because of its religious viewpoint. *See id.* at ¶¶ 47–51, 93–95; *see also* Dkt. No. 1-6, Ex. 6; Dkt. No. 1-22, Ex. 22. This is precisely the type of viewpoint discrimination that the Supreme Court has said violates the Constitution. *See, e.g.*, *Good News Club*, 533 U.S. 98, 107–112.

In its opposition brief, OUSD urges that Plaintiff is not similarly situated to the other organizations on campus because those entities are either lead agencies or subcontractors of those lead agencies. *See* Dkt. No. 33 at 14. But by OUSD's own admission, school administrators do at

9

times allow organizations that are neither lead agencies nor subcontractors to use their facilities after school. *See* Peña Decl. at ¶¶ 20–21; *see also* Dkt. No. 40 at 2 ("[T]he requests are considered on a request-by-request basis . . . ."). Moreover, Plaintiff has provided specific examples of administrators denying Plaintiff's request for space because of its religious affiliation. *See* Compl. at ¶¶ 47–51, 93–95. Even assuming that afterschool space is now controlled by the lead agencies, as OUSD seems to urge, Plaintiff has provided an example of a lead agency similarly denying CEF access as a subcontractor because of its religious affiliation. *See id.* at ¶ 91. OUSD has offered nothing to undermine or rebut these allegations. Moreover, at least on the current record, there do not appear to be any guidelines about how lead agencies should select subcontractors or when lead agencies may allow them space on campus. OUSD cannot, however, evade its obligation to provide equal access to on-campus space by allowing lead agencies to discriminate against religious organizations.

In its supplemental brief, OUSD appears to pivot yet again. Rather than arguing that Plaintiff's facilities requests were denied due to a lack of space, the District suggests that allowing CEF to use space on campus would violate the Establishment Clause because CEF's programming is presented "from a Christian viewpoint." *See* Dkt. No. 40 at 2–3. OUSD contends that consequently, "students from other faiths could not help but experience discrimination because one religion would inevitably be elevated (*i.e.*, sponsored, endorsed, supported) by staff who are working under a District-operated (and government funded) Expanded Learning Opportunities Program." *See* Dkt. No. 40 at 3. By implication then, the District appears to argue that CEF must change its programming to remove its Christian viewpoint in order to have access to facilities before 6:00 p.m. *See id.* (stating that "CEF cannot realistically be given access to Defendants' facilities during the time period when the Expanded Learning Opportunities Program is operating (roughly 3pm–6pm) unless CEF agrees to operate its program under the same terms that all other lead agencies and subcontractors operate their programs"). OUSD provides no support for this contention, and it is simply wrong as a matter of well-established law.

The Supreme Court in *Good News Club* rejected a similar argument, explaining that the Establishment Clause was not implicated because "the Club's meetings were held after school

10

1    hours, not sponsored by the school, and open to any student who obtained parental consent, not

2    just to Club members." *See* 533 U.S. at 113.  So too here.  *See* Compl. at ¶ 17 ("Good News

3    Clubs welcome all children without charging any fee and without regard for religious background

4    or belief, requiring only written permission from parents.").  The fact that OUSD receives

5    government funding for the ASES and ELOP programs does not appear to alter this calculus.  *See,*

6    *e.g.*, *Carson v. Makin*, 596 U.S. 767, 778–89 (2022) (rejecting as unconstitutional state

7    requirement that schools must be "nonsectarian" to receive tuition assistance payments, and

8    finding that Supreme Court Establishment Clause jurisprudence cannot be read "to generally

9    authorize the State to exclude religious persons from enjoyment of public benefits on the basis of

10   their anticipated religious use of the benefits"); *Trinity Lutheran Church of Columbia, Inc. v.*

11   *Comer*, 582 U.S. 449, 458 (2017) (holding that denying grant for resurfacing playgrounds based

12   on recipient's religious status violated Free Exercise clause); *cf. Prince v. Jacoby*, 303 F.3d 1074,

13   1092 (9th Cir. 2002) ("Providing meeting space during student/staff time, school supplies and bus

14   transportation is not a direct payment to the [religious organization's] coffers, even though it may

15   facilitate the [organization's] own religious speech.").  OUSD does not address these cases, and its

16   filings are remarkably short on caselaw.

17          In short, the Court finds that the law and facts clearly favor Plaintiff's position that OUSD

18   violated CEF's free speech rights.[3]

19          **ii.     Remaining *Winter* Factors**

20          OUSD makes no effort to explain why the other three *Winter* factors are not met here.  *See*

21   *generally* Dkt. No. 33.  Regardless, the Court finds that they are plainly met.  Plaintiff is likely to

22   suffer irreparable harm if the Court does not grant preliminary relief because CEF and its Good

23   News Club are excluded from OUSD facilities because of CEF's religious viewpoint.  As the

24   Supreme Court has explained, "[t]he loss of First Amendment freedoms, for even minimal periods

25   of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976);

26   *see also CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 851 (9th Cir.

---

[3] Because this claim provides a sufficient basis to support the preliminary injunction, the Court does not address Plaintiff's additional claims at this time.

1    2019) ("[A] party seeking preliminary injunctive relief in a First Amendment context can establish

2    irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim.")

3    (quotation omitted).

4        The Court likewise finds that the balance of the equities tip in Plaintiff's favor and that it is

5    in the public interest to issue a preliminary injunction.  When the government is a party to a case,

6    the balance of the equities and the public interest factors "merge."  *See Nken v. Holder*, 556 U.S.

7    418, 435 (2009).  These factors are also readily satisfied in the context of alleged constitutional

8    violations such as this because "it is always in the public interest to prevent the violation of a

9    party's constitutional rights."  *See Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (quotation

10   omitted).

11       *     *     *

12       Plaintiff has met all four requirements for preliminary injunctive relief under these

13   circumstances.

14   **IV.   CONCLUSION**

15       Accordingly, the Court **GRANTS** the motion for preliminary injunction.  Dkt. No. 2.  The

16   Court previously directed the parties to meet and confer to discuss whether they could agree on

17   language for the preliminary injunction.  *See* Dkt. No. 37.  The parties were unable to agree and

18   offered competing language in supplemental briefing.  *See* Dkt. Nos. 40–42.  In the absence of

19   agreement, the Court issues the following injunction:

20       Defendants OUSD and the OUSD Interim Superintendent, as well as Defendants' officers,

21   agents, employees, and all other persons acting in active concert and participation with them,

22   including any lead agencies, are hereby **RESTRAINED** and **ENJOINED** from enforcing or

23   applying Defendants' written and unwritten facility use practices and policies, including but not

24   limited to Board Policy 1330 (Dkt. No. 1-1), Administrative Regulation 1330 (Dkt. No. 1-2), and

25   the Terms of Use (Dkt. No. 1-3), against Plaintiff CEF and its Good News Club in any manner

26   that denies CEF and its Club access to OUSD facilities on an equal basis to the access provided to

27   similarly situated nonprofit organizations.  This includes providing equal access to available

28   spaces and benefits in Defendants' facilities at the same time periods and subject to the same

conditions as are made available to other similarly situated nonprofit organizations. Defendants shall provide a final, written response to any application made by Plaintiff to use OUSD facilities within 30 days from the date of the written application. The response shall indicate whether the application was approved or disapproved, and the specific reason(s) for any disapproval.

The Court further **SETS** a case management conference on September 23, 2025, at 2:00 p.m. In addition to the parties, the Court invites a representative of the OUSD to attend the case management conference. The hearing will be held by Public Zoom Webinar. All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg. All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities.

The Court further **DIRECTS** the parties to submit a joint case management statement by September 16, 2025. In light of the parties' inability to agree on the language of the preliminary injunction, the Court will discuss what if any additional language is needed to implement the preliminary injunction and ensure Plaintiff's equal access to OUSD facilities. The parties should also be prepared to discuss how to move this case forward expeditiously, and they should include a proposed schedule for motions for summary judgment.

**IT IS SO ORDERED.**

Dated:   8/15/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge